## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| Timothy Brown, Ronnie Suveg, Joseph Bobertz, Clifford Potters, Stacey Richards, Warren Washburn, Nancy Youngermann, and John Braxton, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>United Parcel Service of America, Inc., the Administrative Committee of the UPS Retirement Plan, and the Board of Trustees of the UPS Pension Plan,<br><br>Defendants. | Civil Action No.:<br><br><br><br><br><br><br><br>**CLASS ACTION COMPLAINT** |

Timothy Brown, Ronnie Suveg, Joseph Bobertz, Clifford Potters, Stacey Richards, Warren Washburn, Nancy Youngermann, and John Braxton (collectively, "Plaintiffs"), by and through their attorneys, on behalf of themselves and all others similarly situated, based on personal knowledge with respect to their own circumstances, and based upon information and belief pursuant to the investigation of their counsel as to all other allegations, allege the following:

## **INTRODUCTION**

1.      This is a class action against United Parcel Service of America, Inc. ("UPS" or the "Company"), the Administrative Committee of the UPS Retirement Plan ("Retirement Plan Committee"), and the Board of Trustees of the UPS Pension Plan

("Board of Trustees") (collectively, the "Defendants"), concerning the failure to pay joint and survivor annuity ("JSA") benefits under the UPS Retirement Plan ("Retirement Plan") and the UPS Pension Plan ("Pension Plan") (collectively, the "Plans") in amounts that satisfy the actuarial equivalence requirements in the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. ("ERISA").  By failing to pay JSA benefits in amounts that are actuarially equivalent to the single life annuities ("SLAs") offered to participants, Defendants are causing retirees to lose part of their vested retirement benefits in violation of ERISA.

2.    UPS is one of the largest employers in the United States and sponsors several defined benefit pension plans.  Following their establishment, the Plans have been maintained by UPS (and other entities within its control group) for the benefit of the Company's employees to help them save for retirement.

3.    Under the Plans, participants earn retirement benefits in the form of a single life annuity ("SLA"), a monthly payment for the rest of their lives when they retire.  The Plans also offer participants the option of receiving their benefits in forms other than an SLA, including a number of JSAs. A JSA is an annuity for the life of the participant with a contingent annuity for the life of the participant's beneficiary (usually a spouse), which is typically expressed as a percentage.  Thus, a 50% JSA is a JSA that pays the spouse half of the amount that was paid to the participant before his or her death; a 75% JSA pays the spouse three quarters.

4.    The monthly benefit payable as a JSA, regardless of the percentage, will be less than the amount payable as an SLA because the JSA must account for the likelihood

that the plan will have pay benefits for a longer period if a participant dies before the spouse.  However, ERISA limits the amount that JSA benefits can be reduced. Under ERISA § 205(d), JSA benefits that pay between 50% to 100% of the amount paid during the joint lives of the participant and spouse ("Qualified Joint and Survivor Annuities" or "QJSAs") must be at least the actuarial equivalent of the SLA.  Two benefit options are actuarially equivalent when they have the same present value, so long as the present values of both benefits are calculated using the same, reasonable actuarial assumptions.

5.     Calculating present value requires inputting actuarial assumptions concerning mortality and interest rates.  Mortality rates for the participant (and, in the case of a JSA, the participant's beneficiary) predict how long the participant and beneficiary will live to account for the likelihood of each future benefit payment being made.  Over the last several decades, mortality rates have generally improved with advances in medicine and better collective lifestyle habits.  People who retired recently are expected to live longer than those who retired in previous generations.  Older mortality tables predict that people near (and after) retirement age will die at a faster rate than current mortality tables.  As a result, using an older mortality table to calculate a conversion factor decreases the present value of a JSA and — interest rates being equal — the monthly payment retirees receive.

6.     The interest rate assumption addresses the time value of money — the idea that a dollar in the hand today is worth more than a dollar paid in a year, or in ten years — and is used to discount the value of expected future payments to the present.  Like mortality, the interest rate also affects the calculation.  Using lower interest rates — mortality rates being equal — decreases the present value of benefits in forms other than an SLA.

3

7.      Mortality and interest rate assumptions, ***together***, generate a "conversion factor," which is expressed as a fraction of the comparator benefit.  If a plan's conversion factor for JSA benefits, relative to either the SLA or a more valuable benefit form, is lower than the conversion factor that would be generated from reasonable actuarial assumptions about mortality and interest rates, then the JSA will not be "actuarially equivalent" to the SLA (or more valuable benefit form). Accordingly, the actuarial assumptions used in the conversion factor directly impact the amount of benefits that participants and their beneficiaries receive each month.

8.      Defendants calculate the conversion factor and, therefore, the value of the JSAs offered to participants, using decades-old mortality assumptions, which, in turn, produces benefits that are not actuarially equivalent to the SLA.  By using mortality tables based on data from the 1960s through the 1980's, Defendants depress the present value of JSA benefits (relative to the SLA) resulting in monthly payments that are materially ***lower*** than they would be if Defendants used reasonable, up-to-date actuarial assumptions. In sum, Defendants are causing Plaintiffs and Class Members to receive less than they should as a pension each month, which will continue to affect them throughout their retirements.

9.      Defendants' use of outdated mortality assumptions to pay JSA benefits is particularly egregious because the Company uses current, updated actuarial assumptions to calculate the Plans' liabilities, which are reported in the Company's audited financial statements and disclosed to investors in public filings.

10.      Plaintiffs seek an order from the Court (1) declaring that the actuarial assumptions used to calculate JSA benefits under the Plans produce benefits that are less

than the actuarial equivalent of the SLA offered to participants; (2) requiring Defendants to pay all amounts improperly withheld in the past and to be withheld in the future; (3) requiring Defendants to recalculate Plaintiffs' JSA benefits in a manner consistent with ERISA's actuarial equivalence requirements; (4) requiring Defendants to increase the amounts of Plaintiffs' future benefit payments; and (5) such other relief as the Court determines to be just and equitable.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of the ERISA.

12.     This Court has personal jurisdiction over Defendants because they transact business in, or reside in, and have significant contacts with this District, and because ERISA provides for nationwide service of process.  Defendant UPS is headquartered in this District and, upon information and belief, the Retirement Plan Committee, Board of Trustees, and their respective members are also based in this District.

13.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all the violations of ERISA occurred in this District and Defendants may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because UPS does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

### Plaintiffs

14.     Plaintiff Timothy Brown is a Participant in the Retirement Plan who worked for UPS for over 31 years.  He began collecting benefits under the Retirement Plan in 2014 and is currently receiving a 100% JSA, with his spouse as the beneficiary.

15.     Plaintiff Ronnie Suveg is a Participant in the Retirement Plan who worked for UPS for over 25 years.  He began collecting benefits under the Retirement Plan in 2014 and is currently receiving a 75% JSA, with his spouse as the beneficiary.

16.     Plaintiff Joseph Bobertz is a Participant in the Retirement Plan who worked for UPS for over 34 years.  He began collecting benefits under the Retirement Plan in 2018 and is currently receiving a 50% JSA, with his spouse as the beneficiary.

17.     Plaintiff Clifford Potters is a Participant in the Retirement Plan who worked for UPS for over 30 years.  He began collecting benefits under the Retirement Plan in 2018 and is currently receiving a 100% JSA, with his spouse as the beneficiary.

18.     Plaintiff Stacey Richards is a Participant in the Retirement Plan who worked for UPS for over 32 years.  She began collecting benefits under the Retirement Plan in 2018 and is currently receiving a 50% JSA, with her spouse as the beneficiary.

19.     Plaintiff Warren Washburn is a Participant in the Retirement Plan who worked for UPS for over 32 years. He began collecting benefits under the Retirement Plan in 2019 and is currently receiving a 50% JSA, with his spouse as the beneficiary.

20.     Plaintiff Nancy Youngermann is a Participant in the Pension Plan who worked for UPS for over 37 years. She began collecting benefits under the Pension Plan in 2015 and is currently receiving a 75% JSA, with her spouse as the beneficiary.

21.     Plaintiff John Braxton is a Participant in the Pension Plan who worked for UPS for over 12 years until 1991. He began collecting benefits under the Pension Plan in 2013 and is currently receiving a 50% JSA, with his spouse as the beneficiary. PlaintiffBraxton did not know, nor did he have any reason to know that his benefits under the Pension Plan were not actuarially equivalent to the SLA he accrued until shortly before he initially filed suit in January 2020.  Additionally, Defendants concealed this fact from him.

**Defendants**

22.     UPS is a global package delivery company, providing logistical services that include transportation, distribution, and freight.  The Company's headquarters and principal place of business is Atlanta, Georgia, and it conducts business throughout the United States.  UPS sponsors the Plans and the Company's Board of Directors has the right to amend or terminate them.  *See* Retirement Plan Document, § 7.1; Pension Plan Document, § 10.1.

23.     Upon information and belief, the Retirement Plan Committee and Board of Trustees are unincorporated associations based in Atlanta, Georgia.  The Retirement Plan Committee is the named fiduciary and the Plan Administrator of the Retirement Plan within the meaning of ERISA §§402(a)(2) and 3(16)(A), , 29 U.S.C. §§1102(a)(2) and 1002(16)(A). *See* Retirement Plan Document, § 9.1. The Board of Trustees is the named

fiduciary and the Plan Administrator of the Pension Plan, within the meaning of those same ERISA provisions. *See* Pension Plan Document, §§ 1.52 and 11.1.

## APPLICABLE ERISA REQUIREMENTS

### *Pension Benefit Options Must Be Actuarially Equivalent*

24.   ERISA requires that defined benefit plans pay married participants and their beneficiaries in the form of a qualified JSA (a "QJSA") unless the participant, with the consent of his or her spouse, elects an alternative form of payment. This makes the QJSA the default benefit for employees who are married.  *See* ERISA § 205(a) and (b), 29 U.S.C. § 1055(a) and (b).

25.   ERISA defines a QJSA as an annuity for the life of the plan participant with a survivor benefit for the life of the spouse that is not less than 50%, and not greater than 100% of the annuity payable during the joint lives of the participant and the spouse.  ERISA § 205(d)(1), 29 U.S.C. § 1055(d)(1).  Accordingly, a plan can offer multiple QJSA options; that is, JSAs that pay survivor benefits between 50% to 100%. *Id.*  The definition of a QJSA includes "any annuity in a form having the effect of an annuity" described in ERISA § 205(d)(1).  *Id.* A QJSA must be actuarially equivalent to an SLA.  *See* 29 U.S.C. § 1055(d)(1); 26 U.S.C. § 417(b).  If a plan offers benefit options that are more valuable than the SLA, the QJSA must be at least as valuable as the most valuable form of benefit. *See id.*; *see also* 26 U.S.C. § 417(b).

26.   Pension plans must also offer participants at least one other form of survivor annuities, known as qualified optional survivor annuities ("QOSA").  *See* ERISA § 205(d)(2), 29 U.S.C. § 1055(d)(2); *see also* 26 U.S.C. § 417(g).  A QOSA is similar to a

QJSA, except that the QOSA's survivor annuity percentage must be: (a) greater than 75% if the QJSA's survivor annuity percentage is less than 75%; and (b) 50% if the QJSA's survivor annuity percentage is greater than 75%.  The definition of a QOSA includes "any annuity in a form having the effect of an annuity" described in ERISA § 205(d)(2).  ERISA requires that QOSAs be actuarially equivalent to an SLA.  *See* ERISA § 205(d)(2)(A)(ii), 29 U.S.C. § 1055(d)(2)(A)(ii).

27.    ERISA also requires that defined benefit plans provide a qualified pre-retirement survivor annuity ("QPSA").  ERISA § 205(a)(2), 29 U.S.C. § 1055(a)(2).  A QPSA is an annuity for the life of the vested participant's surviving spouse (*i.e.*, a beneficiary) if the participant dies before reaching the plan's normal retirement age.  ERISA § 205(e), 29 U.S.C. § 1055(e).  A QPSA must be actuarially equivalent to what the surviving spouse would have received under the plan's QJSA. *See* ERISA § 205(e)(1)(A), 29 U.S.C. § 1055(e)(1)(A).

28.    Reorganization Plan No. 4 of 1978 transferred authority to the Secretary of the Treasury to issue regulations for several provisions of ERISA, including § 205, which concerns alternative forms of benefits.  *See* 92 Stat. 3790 (Oct. 17, 1978), codified at 29 U.S.C. § 1001.

29.    The Treasury regulations for the Internal Revenue Code (the "Tax Code") provision corresponding to ERISA § 205 (26 U.S.C. § 401(a)(11)) provide that a QJSA "must be at least the actuarial equivalence of the normal form of life annuity or, if greater,

of any optional form of life annuity offered under the plan."[1] Indeed, a QJSA "must be as least as valuable as any other optional form of benefit under the plan at the same time." 26 C.F.R. § 1.401(a)-20 Q&A 16; *see* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) ("All other optional forms of benefit payable to the participant must be compared with the QJSA using a single set of interest and mortality assumptions that are reasonable and that are applied uniformly with respect to all such optional forms payable to the participant . . . ."). The regulations regarding QJSAs apply "when the participant attains the earliest retirement age under the plan." 26 C.F.R. § 1.401(a)-20 Q&A 17.

30. ERISA does not require that pension plans offer lump sum distributions of vested benefits to retirees upon their retirement. *See* ERISA § 205(g), 29 U.S.C. § 1055(g). However, if plans offer a lump sum distribution as an optional benefit, ERISA § 205(g)(3), 29 U.S.C. § 1055(g)(3), requires the present value of the lump sum be determined using the applicable mortality table (the "Treasury Mortality Table")[2] and applicable interest rate (the "Treasury Interest Rate")[3] (collectively, the "Treasury Assumptions"), which are set by the Secretary of the Treasury (the "Secretary") pursuant to IRC §§ 417(e) and 430(h)

---

[1]    26 C.F.R. § 1.401(a)-11(b)(ii)(2). The term "life annuity" includes annuities with terms certain in addition to single life annuities. As the Treasury Regulations explain, "[t]he term 'life annuity' means an annuity that provides retirement payments and requires that survival of the participant or his spouse as one of the conditions for payment or possible payment under the annuity. For example, annuities that make payments for 10 years or until death, whichever occurs first or whichever occurs last, are life annuities." 26 C.F.R. § 1.401(a)-11(b)(1)(i).

[2]    *See* 26 C.F.R. § 1.430(h)(2)-1.

[3]    *See* 26 C.F.R. § 1.430(h)(3)-1.

and are based on current market rates and mortality assumptions. *See* 29 U.S.C. § 1055(g)(3)(B); 29 U.S.C. § 1083(h), 26 U.S.C. §§ 417(e) and 430(h).

31.     ERISA § 203(a), 29 U.S.C. § 1053(a), provides that an employee's right to the vested portion of his or her normal retirement benefit is non-forfeitable.  ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3), provides that if an employee's accrued benefit is in the form other than an SLA, the accrued benefit "shall be the actuarial equivalent" of an SLA.

32.     The Treasury regulation for the Tax Code provision corresponding to ERISA § 203 (26 U.S.C. § 411), states that "adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable."  26 C.F.R. § 1.411(a)-4(a).

### Reasonable Factors Must Be Used When Calculating Actuarial Equivalence

33.     "Two modes of payment are actuarially equivalent when ***their present values are equal*** under a given set of assumptions."  *Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (emphasis added) (citing Jeff L. Schwartzmann & Ralph Garfield, Education and Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1-24-91 (1991) ("Schwartzmann & Garfield").[4]

34.     Under ERISA, "present value" must "reflect anticipated events."  Such adjustments "shall conform to such regulations as the Secretary of the Treasury may prescribe."  ERISA § 3(27), 29 U.S.C. § 1002(27).  The Secretary has prescribed several Regulations describing how present value should reasonably reflect anticipated events, including:

---

[4]     According to Merriam Webster: "Equivalent" means "equal." *See* https://www.merriam-webster.com/dictionary/equivalent.  "Equal" means the "same." https://www.merriam-webster.com/dictionary/equal

(a)     The Regulation concerning QJSAs provides that "[e]quivalence may be determined, on the basis of consistently applied ***reasonable actuarial factors,*** for each participant or for all participants or reasonable groupings of participants." 26 C.F.R. § 401(a)-11(b)(2) (emphasis added).

(b)     A plan must determine optional benefits using "a single set of ***interest and mortality assumptions that are reasonable*** . . . ." 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) (emphasis added).

(c)     The term actuarial present value means "actuarial present value (within the meaning of § 1.401(a)(4)-12) determined using ***reasonable actuarial assumptions***." 26 C.F.R. §1.411(d)-3(g)(1) (emphasis added).

(d)     With respect to benefits under a lump sum-based formula, any optional form of benefit must be "at least the actuarial equivalent, using ***reasonable actuarial assumptions*** . . . ." 26 C.F.R. § 1.411(a)(13)-1(b)(3) (emphasis added).

35.     The Regulations also rely on the standards of the Society of Actuaries (the "SOA") for determining the present value of pension liabilities. *See, e.g.,* 26 C.F.R. § 1.430(h)(3)-1(a)(2)(C); IRS Notices: 2008-85, 2013-49, 2015-53, 2016-50, 2018-02; 82 Fed. Reg. 46388-01 (Oct. 5, 2017) ("Mortality Tables for Determining Present Value Under Defined Benefit Plans"), 72 Fed. Reg. 4955-02 (Feb. 2, 2007) ("Updated Mortality Tables for Determining Current Liability").

36.     Like the Regulations and ERISA's definition of " present value," the Actuarial Standards of Practice ("ASOPs") issued by the Actuarial Standards Board

("ASB")[5] of the American Academy of Actuaries (the "Academy"), require actuaries to use "reasonable assumptions." *See* ASOP No. 27, Para. 3.6 ("each economic assumption used by an actuary should be reasonable"). *See also* ASOP No. 35, Para. 3.3.5 ("Each demographic assumption selected by the actuary should be reasonable").

37. Courts interpreting ERISA's actuarial equivalence requirements when calculating benefits have stated that "***special attention must be paid to the actuarial assumptions underlying the computations***." *Pizza Pro Equip. Leasing v. Comm. of Revenue*, 147 T.C. 394, 411 (emphasis added), *aff'd,* 719 Fed. Appx. 540 (8th Cir. 2018). As the court explained in *Dooley v. Am. Airlines, Inc.*, each actuarial assumption used to calculate QJSAs, QOSAs and QPSAs must be reasonable:

> When the terms of a plan subject to ERISA provide that plan participants may opt to receive their accrued pension benefits in forms other than as a single life annuity, the amount payable to the plan participant under such circumstances must be "actuarially equivalent" to the participant's accrued benefits when calculated as a single life annuity. The term actuarially equivalent means equal in value to the present value of normal retirement benefits, ***determined on the basis of actuarial assumptions with respect to mortality and interest which are reasonable in the aggregate***.

*Dooley v. Am. Airlines, Inc.*, 1993 WL 460849, at *10 (N.D. Ill. Nov. 4, 1993) (emphasis added); *see also Dooley v. Am. Airlines, Inc.*, 797 F.2d 1447, 1453 (7th Cir. 1986) (citing

---

[5]     The ASB, an independent entity created by the Academy in 1988, serves as the single board promulgating standards of practice for the entire actuarial profession in the United States. The ASB was given sole authority to develop, obtain comment upon, revise, and adopt standards of practice for the actuarial profession.

expert testimony that "actuarial equivalence must be determined on the basis of reasonable actuarial assumptions.").

38.     Actuarial equivalence should be "cost-neutral," meaning that neither the plan nor the participants should be better or worse off if a participant selects an SLA or a JSA. *See Bird v. Eastman Kodak Co.*, 390 F.Supp.2d 1117, 1118–19 (M.D. Fla. 2005). "Periodically, the assumptions used [for actuarial equivalence] must be reviewed and modified so as to insure that they continue to fairly assess the cost of the optional basis of payment."  Schwartzmann & Garfield at 11; *see also Smith v. Rockwell Automation*, No. 19-CV-0505, 2020 WL 620221, * 7 (E.D. Wisc. Jan. 10, 2020) ("plans must use the kind of actuarial assumptions that a reasonable actuary would use at the time of the benefit determination.").

<u>**SUBSTANTIVE ALLEGATIONS**</u>

**I.  Applicable Terms of the Plans**

    **A.    The Retirement Plan**

39.     UPS established the Retirement Plan on September 1, 1961. *See* Retirement Plan Document, § 1.1(y).  Pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), the Retirement Plan is established and maintained according to a written instrument (the "Retirement Plan Document").

40.     The Retirement Plan covers eligible employees of UPS and certain of its subsidiaries, termed "Employer Companies."[6]   *See* Retirement Plan Document at § 1.01(aa) and at Appendix H.  The Retirement Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and a "defined benefit plan" within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

41.     Participants earn retirement benefits based on a percentage of their compensation, how many years they worked for UPS, and a point system depending on when their respective Employer Company began participating in the Retirement Plan ("Final Average Pay Formula").  Retirement Plan Document, § 5.2.  Under the Final Average Pay Formula, participants earn benefits as an SLA.  *Id.*

42.     The Retirement Plan's QJSA, and the default form of benefit for married participants, is a 50% JSA.  For unmarried participants, the default form of benefit is an SLA for participants who began working for UPS after January 1, 1992, and a 10-year life and certain annuity ("10YCLA") if the participant started working for UPS before January 1, 1992. *Id.*, § 1.1(rr).  The Retirement Plan also offers a 75% JSA and a 100% JSA as QOSAs.  *Id.*, § 5.04(d).

43.     The Retirement Plan states that QJSAs and QOSAs are the "Actuarial Equivalent of the Participant's benefit payable in the Normal Form."  *Id.*, § 5.04(d)(i).

44.     The Retirement Plan defines the term "Actuarial Equivalent" as:

---

[6]     The Retirement Plan was closed to new non-union participants effective July 1, 2016. Retirement Plan, Form 5500 (2020), Notes to Financial Statements at 4.  Further, in the year ended December 31, 2017, the Company amended the Retirement Plan to cease accruals of additional benefits for future service and compensation for non-union participants effective January 1, 2023. *Id.*

> [A] benefit in the aggregate equality in value to the amounts expected to be received under the Normal Form of benefit based upon an interest rate of 6% and the 1983 GAM Mortality Table for Males for Participants and the 1983 GAM Mortality Table for Females for Beneficiaries and Alternate Payees. ("1983 GAM/6%").

*Id.*, § 1.1(b)(i).

45.     UPS uses the 1983 GAM/6% to calculate the 10YCLA option for participants in the "Retirement Plan for Employees of Overnite Transportation" ("Grandfathered Overnite Participants"), which merged into the Retirement Plan. For the 50% and 100% JSA options, however, Grandfathered Overnite Participants receive the greater of the amount calculated using the 1983 GAM/6% or the UP 1984 Unisex Pension Mortality Table and a 7% interest rate ("UP-84/7%). *See Id.,* § 1.01(b)(ii)(B)(1).

46.     UPS uses the 1983 GAM/6% to calculate the 10YCLA option for participants in the "Motor Cargo Plan" ("Grandfathered Motor Cargo Participants"), which merged into the Retirement Plan. For the 50% JSA, 100% JSA and 5YCLA, however, Grandfathered Motor Cargo Participants receive the greater of the amount calculated using the 1983 GAM/6% or the UP 1984 Unisex Pension Mortality Table and an 8% interest rate ("UP-84/8%"). *Id.*, § 1.01(b)(ii)(C)(1).

47.     Effective January 1, 2008, eligible employees hired, re-hired, or transferred into the Retirement Plan accrued, and continue to accrue, benefits under a cash balance formula called the "Portable Account Formula." *See id.*, § 5.3(g). Under the Portable Account Formula, UPS contributes a percentage of the participant's compensation to a hypothetical account ("Portable Account") in the Retirement Plan which accumulates interest. *Id*.

48.     Participants who earn a benefit under a Portable Account Formula may receive their benefits in a lump sum equal to the value of their Portable Account.  *See id.*, § 5.4(h).  They may also receive their benefits as an SLA, 50% JSA, 100% JSA and, if eligible, any of the Retirement Plan's other optional forms of benefits.  *Id*.  If participants receive their benefits as an annuity, their Portable Account is first converted to an SLA using the Treasury Assumptions.  *Id*., § 5.4(h)(ii).  If participants receive another form of an annuity, including a 50% JSA, 75% JSA, or 100% JSA, the 1983 GAM/6% is used to convert their SLA to these other forms.  *Id*.; *see also* § 1.1(b)(i).

**B.     The Pension Plan**

49.     UPS established the Pension Plan on January 1, 1973.  Pension Plan Document, opening recitals.  In accordance with ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), the Plan is established and maintained under a written instrument (the "Pension Plan Document").

50.     The Pension Plan covers eligible employees of UPS and its subsidiaries and affiliates that adopt the plan.  The Pension Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and a "defined benefit plan" within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

51.     Participants in the Pension Plan earn retirement benefits under a Final Average Pay Formula as an SLA.  *See* Pension Plan Document, §§ 3.3, 4.1.

52.     The "normal form" of benefit for a single participant in the Pension Plan is an SLA.  *See id.,* § 4.11(a).  For married participants, the "normal form," and the Pension

Plan's QJSA, is a 50% JSA, which the Plan Document states "shall be the Actuarial Equivalent of [a participant's SLA]." *See id.*

53. Participants can also receive their retirement benefits as a 75% JSA, 100% JSA or a 10YCLA. *See id.*, § 4.11(b). According to the Pension Plan Document, each optional form of benefit "will be the Actuarial Equivalent to the Participant's [SLA]." *Id.*

54. To convert the SLA to the QJSA or one of the forms of optional benefits for participants hired after 2007, the Pension Plan uses the all-male 1983 GAM mortality table for ***all*** participants and the all-female 1983 GAM mortality table for ***all*** beneficiaries and a 6% interest rate. *See id.*, § 1.1(a)(1). Participants hired before 2007 who worked for UPS after 1990 who select a QJSA receive the greater of: (a) the amount calculated using the 1983 GAM/6%; or (b) 88% of the SLA during the life of the participant (with adjustments for the age difference between the participant and the spouse). *See id.*, § 1.1(a)(2)(i). Participants hired before 2007 who worked for UPS after 1990 who select the 75% JSA, 100% JSA or a 10YCLA have their benefits calculated using the 1983 GAM/6%. *Id.*

55. For participants who are Grandfathered Overnite Participants or Grandfathered Motor Cargo Participants, UPS uses the same actuarial assumptions as described in ¶¶ 45–46, above.

**II. The Plans' JSAs Do Not Satisfy ERISA's Actuarial Equivalence Requirements**

A. **Actuarial Assumptions Used to Determine Actuarial Equivalence Must Be Reasonable as of the Date Benefits Are Calculated**

56. As discussed above, to compare the value of two benefit options offered to a plan participant at the time she begins collecting benefits, it is necessary to determine the

present value of the ***aggregate*** (*i.e.,* total) future benefits that the participant (and, if applicable, the beneficiary) is expected to receive under each form using actuarial assumptions that are reasonable as of that date. There are two main components of these present value calculations: (1) an interest rate; and (2) the mortality table applied to participants and beneficiaries.

57.     An interest rate is used to determine the present value of each future payment. This is based on the time value of money, meaning that money available now is worth more than the same amount in the future due to the ability to earn investment returns.  The rate is often called a "discount rate" because it discounts the value of a future payment. *Berger v. Xerox Corp. Retirement Income Guar. Plan*, 338 F.3d 755, 759 (7th Cir. 2003).  ("A discount rate is simply an interest rate used to shrink a future value to its present equivalent.").

58.     The interest rate used by a defined benefit plan to calculate present value must be reasonable based on prevailing market conditions, which "reflect anticipated events." *See* 29 U.S.C. § 1002(27).  The interest rate may be broken into segments of short-term, medium-term and long-term expectations pertaining to each future payment. *See, e.g.*, ERISA §§ 205(g)(3)(B)(iii) and 303(h)(2), 29 U.S.C. §§ 1055(g)(3)(B)(iii) and 1083(h)(2).

59.     As alleged above, pursuant to para. 3.6 of ASOP No. 27,[7] "each economic assumption used by an actuary should be reasonable."[8] An assumption is deemed "reasonable" if it "reflects the actuary's professional judgment," "takes into account historical and current economic data that is relevant as of the **measurement date**," and "reflects the actuary's estimate of future experience." *See* ASOP No. 27, Para. 3.6 (emphasis in original). The Treasury Interest Rates are reasonable because they are updated to reflect current economic conditions.

60.     A mortality table is a series of rates which predict how many people at a given age will die before attaining the next higher age.

61.     More recent mortality tables are "two-dimensional" in that the rates are based not only on the age of the individual but the year of birth. The SOA, an independent actuarial group, publishes the mortality tables that are the most widely used by defined benefit plans when doing these conversions. The SOA published mortality tables in 1971 (the "1971 GAM"), 1976 (the "UP 1984"), 1983 (the "1983 GAM"), 1994 (the "1994 GAR"), 2000 (the "RP-2000"), 2014 ("RP-2014"), and 2019 (the "Pri-2012") to account for changes to the population's mortality experience.

62.     Since at least the 1980s, the life expectancies in mortality tables have been on an upward trend as shown below:

---

[7]     Courts look to professional actuarial standards as part of this analysis. *See, e.g. Stephens*, 644 F.3d at 440 (citing Schwartzmann & Garfield).

[8]     Available at: https://www.actuarialstandardsboard.org/asops/selection-economic-assumptions-measuring-pension-obligations/ (last accessed on January 21, 2020).



Source: Aon Hewitt, *Society of Actuaries Finalizes New Mortality Assumptions: The Financial and Strategic Implication for Pension Plan Sponsors* (November 2014), at 1.[9] According to this paper, there have been "increasing life expectancies over time" and just moving from the 2000 mortality table to the 2014 table would increase pension liabilities by 7%.

63.     Pursuant to para. 3.5.3 of ASOP 35,[10] actuarial tables must be adjusted on an ongoing basis to reflect improvements in mortality.[11]

64.     Accordingly, in the years between the publication of a new mortality table, mortality rates are "projected" to future years to account for expected improvements in mortality. For example, in 2017, the Treasury Mortality Table was the RP-2000 mortality

---

[9]     Life expectancies with a projection scale assume a generational projection of future mortality improvements (i.e., life expectancies increase with year of birth).

[10]    *See* n. 9, *supra*.

[11]    *See* http://www.actuarialstandardsboard.org/asops/selection-of-demographic-and-other-noneconomic-assumptions-for-measuring-pension-obligations/#353-mortality-and-mortality-improvement (last accessed on January 21, 2020).

table adjusted for mortality improvement using Projection Scale AA to reflect the impact of expected improvements in mortality. IRS Notice 2016-50.[12]   In 2018, the Treasury Mortality Table was the RP-2014 mortality table projected to account for additional improvement in mortality rates that have occurred since 2014. IRS Notice 2017-60.[13]

65.     For purposes of the present value analysis under ERISA, the mortality table must be updated and reasonable "to reflect anticipated events." 29 U.S.C § 1002 (27).  The Treasury Mortality Tables are updated and reasonable. *See* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv).  Accordingly, the Treasury Assumptions are reasonable.

66.     Using a reasonable interest rate and mortality table, the present values of the SLA and the other forms of benefit can be compared to determine whether those forms of benefit are actuarially equivalent to the SLA.  Plans must use reasonable interest rates and mortality tables to evaluate whether the present values of benefit options produce equivalent benefits for participants and beneficiaries.

**B.     The Actuarial Assumptions That UPS Uses to Calculate the Plans' Liabilities Are Significantly Different Than Those Used to Calculate JSAs**

**1.     UPS Uses Updated Actuarial Assumptions to Calculate Its Financial Obligations to Pay Benefits**

67.     For purposes of its filings with the U.S. Securities and Exchange Commission ("SEC"), UPS uses reasonable, current mortality assumptions to calculate the present value of its benefit obligations under the Plans.  Specifically, UPS's audited

---

[12]     *See* https://www.irs.gov/pub/irs-drop/n-16-50.pdf.
[13]     *See* https://www.irs.gov/pub/irs-drop/n-17-60.pdf.

financial statements are prepared in accordance with the Generally Accepted Accounting Principles ("GAAP"), pursuant to which, mortality assumptions must reflect the best estimate for that assumption as of the current measurement date.  This principle regarding the mortality assumptions used by defined benefit plans was stated in a publication by Deloitte & Touche LLP ("Deloitte"), the Company's auditor:[14]

> This publication highlights some of the important accounting considerations related to the calculations and disclosures entities provide under U.S. GAAP in connection with their defined benefit pension and other postretirement benefit plans.
>
> ***
>
> **Mortality Assumption**
>
> …Frequently, actuaries recommend published tables that reflect broad-based studies of mortality.  Under ASC[15] 715-30 and ASC 715-60, ***each assumption should represent the "best estimate" for that assumption as of the current measurement date***. Entities should consider whether the mortality tables used and adjustments made (*e.g.*, for longevity improvements) are appropriate for the employee base covered under the plan. (Emphasis added.) …[16]

68.    For example, UPS advised in its annual report on Form 10-k for the fiscal year ending December 31, 2014 (the "2014 Form 10-k"), that the Company employed the most recently published mortality tables at that time, namely the (RP-2014), and an updated improvement scale, to calculate its pension and other postretirement obligations,

---

[14]    Among other things, Deloitte prepares the annual Report of Independent Registered Public Accounting Firm for purposes of UPS's filings with the SEC.

[15]    "ASC" is an acronym for Accounting Standards Codification.

[16]    Deloitte, Financial Reporting Considerations Related to Pension and Other Postretirement Benefits, Financial Reporting Alert 19-2, November 1, 2019 at 1, 4-5.

recognizing the well-documented improvements to mortality.  In particular, UPS's 2014 Form 10-k provides:

> NOTE 1. SUMMARY OF ACCOUNTING POLICIES
>
> *Pension and Postretirement Benefits*
>
> We incur certain employment-related expenses associated with pension and postretirement medical benefits. ***These pension and postretirement medical benefit costs for company-sponsored benefit plans are calculated using various actuarial assumptions and methodologies***, including discount rates, expected returns on plan assets, healthcare cost trend rates, inflation, compensation increase rates, mortality rates, and other factors. ***Actuarial assumptions are reviewed on an annual basis, unless circumstances require an interim remeasurement date for any of our plans***. (Emphases added.)
>
> *     *     *
>
> NOTE 4. COMPANY-SPONSORED EMPLOYEE BENEFIT PLANS
>
> Actuarial Assumptions
>
> Society of Actuaries[] ("SOA") published mortality tables and improvement scales are used in developing the best estimate of mortality for plans in the U.S. On October 27, 2014, the SOA published updated mortality tables and an updated improvement scale, both of which reflect longer anticipated lifetimes. ***Based on an evaluation of these new tables and our perspective of future longevity, we updated the mortality assumptions for purposes of measuring pension and other postretirement benefit obligations at December 31, 2014***. The change to the mortality assumption increased the year-end pension and other postretirement benefit obligations by $1.119 billion and $51 million, respectively. At December 31, 2014, we also revised the retirement assumptions for non-union plan participants based on recent retirement experience. The change to the retirement assumption decreased the year-end

pension and other postretirement benefit obligations by \$383 and \$234 million, respectively.[17] (Emphasis added.)

69.     Throughout the relevant period, as reported in the Company's filings with the SEC, UPS has consistently reviewed and updated the mortality assumptions it uses to calculate the present value of its benefit obligations.  For example, the Company's Form 10-k for the fiscal year ending December 31, 2015 provides that, "[a]ctuarial assumptions are reviewed on an annual basis, unless circumstances require an interim remeasurement date for any of our plans." (Emphasis added.)   The following year, UPS likewise reported in its Form 10-k for the fiscal year ended December 31, 2016 that, "[a]ctuarial assumptions are reviewed on an annual basis, unless circumstances require an interim remeasurement date for any of our plans." (Emphasis added.)   In its most recent available Form 10-k, for the fiscal year ended December 31, 2021 (the "2021 Form 10-k"), the Company again advised that in light of the SOA's publication of a new mortality improvement scale, it "updated the mortality assumptions," to compute its pension and other post retirement obligations based on the SOA's publication of a new mortality improvement scale.[18]

70.     UPS's methodology to determine the discount rate used to determine the actuarial present value of benefits accrued under the Plans is also consistent with ASOP 27 and reflects current economic conditions.  UPS uses a "bond matching approach to select

---

[17]     *See* UPS's Form 10-k for the year ending December 31, 2014 at 75, available at: https://www.sec.gov/Archives/edgar/data/1090727/000109072715000008/ups-12312014x10k.htm

[18]     *See* UPS Form 10-k for year ending December 31, 2021 at 78, available at: https://investors.ups.com/sec-filings/all-sec-filings?form_type=10-K&year=

specific bonds that would satisfy [its] projected benefit payments," which UPS "believe[s]…reflects the process [it] would employ to settle" its pension obligations under the Plans (noting that "[t]hese assumptions are updated each measurement date, which is typically annually").[19] The discount rates UPS used to calculate the actuarial present value of the Plans' liabilities since 2012 are shown in the chart below.[20]

| Year | Discount Rate |
|------|---------------|
| 2012 | 4.42% |
| 2013 | 5.32% |
| 2014 | 4.40% |
| 2015 | 4.86% |
| 2016 | 4.41% |
| 2017 | 3.84% |
| 2018 | 4.50% |
| 2019 | 3.60% |
| 2020 | 2.90% |
| 2021 | 3.13% |

71.    The discount rates that UPS used based on its "bond matching approach" were consistent with similarly sized companies' discount rates and consistent with the FTSE Pension Liability Index and the Mercer Yield Curve, which are widely used in the pension industry and would have been reasonable discount rates to use when determining JSA benefits under the Plans.

---

[19]    *See*, *e.g.*, UPS's Form 10-k for the year ending December 31, 2021 at 75.

[20]    *See* n. 17 and n. 18, *supra*, at 74 and 82, respectively; *see also* UPS's Form 10-k for the year ending December 31, 2013 at 74.

72.   UPS updates the mortality assumptions used in its financial statements to predict for its shareholders the potential costs associated with the Plans based on the SOA's publications.  For its participants in those Plans, however, UPS continues to convert SLAs to other forms of benefits using outdated and otherwise flawed mortality assumptions.

**2.   The Plans Use Unreasonable Assumptions to Calculate JSAs, Reducing Participants' Benefits in Violation of ERISA.**

73.   Throughout the relevant period, UPS used:

a.   The 1983 GAM/6% to calculate the JSAs and QPSAs under the Plans;

b.   The 1983 GAM/6% or the UP-84/7% to calculate the JSAs for Grandfathered Overnite Participants; and

c.   The 1983 GAM/6% or the UP-84/8% to calculate JSAs for Grandfathered Motor Cargo Participants.

74.   Defendants' use of these actuarial assumptions was unreasonable because the mortality tables are each outdated and do not "reflect anticipated events" (*i.e.*, the anticipated mortality rates of participants).  The 1983 GAM table uses the mortality rates of people who had ***already retired*** by 1966, with "projected additional mortality improvements to 1983 based on 1966 trends…"  Emily K. Kessler, *Turning the Tables: Mortality Tables Should Reflect Improving Mortality*, Society of Actuaries' Pension Section News, Jan. 2006 – Issue No. 60, at 1 ("Kessler").  Accordingly, it was ***not*** developed from a population that "has characteristics that are typical of the plan's participants."  *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1110 (9th Cir. 2000) (citing

Fellers & Jackson at 456); *see also* Kessler at 2 (stating in **2006** that "most of [the population used to construct the 1983 GAM table] are probably dead.").

75.     The 1983 GAM table that UPS uses to calculate *participants' benefits* is based on data from over 50 years ago, and as such, it overstates mortality rates. Under the 1983 GAM table, a 65-year-old male has an average life expectancy of 16.7 years and a 65-year-old female has an average life expectancy of 21.3 years. Using the RP-2014, however, a 65-year-old male has a life expectancy of 21.6 years, a 27.5% increase, and females have a life expectancy of 23.8 years, an 11.7% increase.  Accordingly, the average retiring employee would be expected to receive, and the average employer would be expected to pay, benefits for a substantially longer period of time than in the 1983 GAM table.

76.     Defendants exacerbated the differences between mortality rates in the 1983 GAM table and today by using a male-only table for participants, which does not account for males' greater improvements in mortality over the past 40 years relative to females.

77.     As an example of Defendants' biased approach to actuarial equivalence computations, both the Pension Plan and the Retirement Plan use the **all-male** 1983 GAM mortality table to estimate the life expectancies of participants and the **all-female** 1983 GAM mortality table to estimate beneficiaries' life expectancies.  In other words, the calculations are based on the assumption that **all** participants are male, and **all** beneficiaries are female.  This assumption causes JSA benefits under the Plan to be **even lower**, because mortality rates for women are lower than those for men, and there was an even greater disparity 40 years ago when the 1983 GAM table was published.  Kessler at 4 ("Male

mortality has improved significantly" since the 1983 GAM table was published). This unreasonable demographic assumption, accordingly, exacerbates the injury caused by using the antiquated 1983 GAM table.

78.     The demographic assumption is clearly flawed; numerous Plan participants are female and numerous beneficiaries are men. For instance, Youngermann, a Pension Plan participant, is a female, while her husband, a Pension Plan beneficiary, is a male. Likewise, Richards, a Retirement Plan participant is a female, while her husband, a Retirement Plan beneficiary, is a male. Consequently, among other things, Defendants have failed to use the appropriate gender-related factors for purposes of the actuarial equivalence calculation.

79.     Defendants' use of the UP-84 table to calculate JSAs for Grandfathered Motor Cargo Participants and Grandfathered Overnite Participants is similarly unreasonable because it is antiquated and overstates mortality rates compared to contemporary mortality tables. The UP-84 table is even more out-of-date than the 1983 GAM as it was published in 1976 and was based on data from the 1960s.

80.     Defendants failed to provide JSAs that were actuarially equivalent to the SLA that participants were entitled to receive when they retired as required by ERISA § 205(d), 29 U.S.C. § 1055(d). By using outdated or otherwise flawed mortality assumptions, Defendants have materially reduced the monthly benefits that participants and beneficiaries under the Plans receive in comparison to the monthly benefits they would receive if Defendants applied updated, reasonable mortality assumptions. Moreover, Defendants' use of unreasonable, excessive actuarial reductions has caused many Plan

participants, including Plaintiff Braxton, to forfeit part of their accrued benefits in violation of ERISA § 203(a), 29 U.S.C. § 1053(a).

> **3.** **Defendants Knew the Assumptions Used to Calculate JSA Benefits Were Antiquated and Did Not Reflect the Actual Experience of Participants.**

81.     During all relevant times, Defendants knew or should have known that the male-only 1983 GAM table and the UP-84 tables employed for the actuarial equivalence calculations under the Plans were unreasonable, and that using them produced lower monthly benefits for participants and beneficiaries receiving JSAs calculated using formulas based on these antiquated mortality tables.

82.     In 2013, UPS used the RP-2000 — the most up-to-date mortality table at the time — to calculate its *pension liabilities*, based on an experience study it conducted regarding the specific mortality experience of the Plans' participants and beneficiaries. Thereafter, UPS began using the RP-2014, an even more modern mortality table, immediately after it was published by the SOA in 2014, to calculate its liabilities under the Plans.  Then, in 2015 — before several Plaintiffs had begun collecting benefits — Willis Towers Watson ("WTW"), the actuary for the Plans, emailed UPS highlighting the Retirement Plan's outdated mortality assumptions.  WTW stated that by updating the mortality table from the 1983 GAM to the RP-2014, it would increase the Retirement Plan's Projected Benefit Obligations ("PBO") by $350 million or 2.2% of the PBO for participants who have not yet commenced payment. WTW noted that the impact would be lower if the plan also updated its 6% interest rate assumption, but maintained that changing the mortality assumption to mirror what UPS was using to value its plan liabilities in its

10-k reports would still significantly increase the value of JSA benefits even if that change was coupled with a lower interest rate assumption.

83.     Several years later, in 2018, WTW provided the Company with the results of a new mortality experience study based on the "actual mortality experience" of Retirement Plan participants from 2013 – 2017 and concluded that their actual mortality rates closely tracked (and were even slightly better) than those in the RP-2014 mortality table that UPS had been using on WTW's advice.  Still, UPS did not update the actuarial assumptions used to calculate JSA benefits under the Plans.

84.     As alleged above, contrary to the biased and unreasonable methodologies employed to compute JSA and QPSA benefits under the Plans, UPS used updated mortality tables in its financial statements at all relevant times.  Specifically, in its audited financial statements, UPS used reasonable actuarial assumptions to report a greater liability for benefits than it was paying out using the unreasonable, male-only 1983 GAM/6%, UP-84/7% and UP-84/8%.  There was and is no reasonable justification for Defendants to use old mortality tables that presume an earlier death and an earlier end to benefit payments to calculate unfairly low benefits for participants, while at the same time using reasonable, contemporary mortality tables to project a longer duration of these very same benefit payments for annual financial reporting.

85.     Since these two analyses measure the length of the very same lives and the very same benefit streams, they should use the same mortality assumptions.  "ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit . . . 'If plans were free to determine their own assumptions

31

and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of actuarial equivalence.'" *Laurent v. PriceWaterhouseCoopers LLP*, 794 F.3d 272 (2d Cir. 2015) *quoting*, *Esden v. Bank of Boston*, 229 F.3d 154, 164 (2d Cir. 2000).

86.    Defendants also have continued to use these antiquated mortality assumptions despite using the reasonable Treasury Assumptions to convert participants' Portable Accounts to SLAs in the Retirement Plan.

87.    Further, UPS uses a more modern definition of "actuarial equivalence" when calculating JSAs in another defined benefit plan that it sponsors: the "UPS/IBT Full-Time Employee Pension Plan."   In that plan, UPS uses a 6% interest rate and the RP-2000 Mortality Table, adjusted for improvements through 2010.

88.    Had the Plans used reasonable actuarial assumptions, such as the Treasury Assumptions or the Treasury Mortality Table and the discount rate UPS uses in its Form 10-k, Plaintiffs and the Class would have received, and would continue to receive, actuarially equivalent benefits that are greater than the benefits they currently receive.

89.    For example, Plaintiff Timothy Brown started collecting benefits at age 55 with an accrued SLA of $3,301.35 per month.   He selected a 100% JSA, which pays $2,816.38 a month.   If reasonable, up-to-date assumptions had been applied when Mr. Brown retired, his benefit would be higher.   For example, using the Treasury Mortality Table (weighted 50% male) that was current when he retired and 5.32%, the discount rate that UPS used in its 2013 Form 10-k to measure its pension liabilities, Mr. Brown's benefit should have been $2,997.38, which is $181 or approximately 6.5% more per month.   By

reason of the use of the 1983 GAM/6% instead of reasonable, up-to-date assumptions, Mr. Brown suffered past damages (without interest) of $13,575 and the present value of his future damages is $35,653.70 for a total of $49,228.70.

90.    In another example, Plaintiff Ronnie Suveg started collecting benefits when he was 61 years and 10 months old with an accrued SLA of $2,494.22. He selected a 75% JSA, which pays $2,070.95 a month. If reasonable, up-to-date assumptions had been applied when Mr. Suveg retired, his benefit would be $2,184.15, which is $113.20 or approximately 5.5% more per month. By reason of the use of the 1983 GAM/6% instead of reasonable, up-to-date assumptions, Mr. Suveg suffered past damages (without interest) of $7,371 and the present value of his future damages is $20,303.84 for a total of $27,674.84.

91.    Likewise, Plaintiff Joseph Bobertz started collecting benefits when he was 62 years and 7 months old with an accrued SLA of $4,313.33. He selected a 50% JSA, which pays $3,838.86 a month. If reasonable, up-to-date assumptions had been applied when Mr. Bobetz retired, his benefit would be $3,970.52, which is $131.66 or approximately 3.5% more per month. By reason of the use of the 1983 GAM/6% instead of reasonable, up-to-date assumptions, Mr. Bobertz suffered past damages (without interest) of $3,554.82 and the present value of his future damages is $23,211.78 for a total of $26,766.60.

92.    Plaintiff Clifford Potters started collecting benefits when he was 57 years and 8 months old with an accrued SLA of $3,160.12. He selected a 100% JSA, which pays $2,639.33 a month. If reasonable, up-to-date assumptions had been applied when Mr.

Potters retired, his benefit would be $2,792.17, which is $152.84 or approximately 6% more per month.  By reason of the use of the 1983 GAM/6% instead of reasonable, up-to-date assumptions, Mr. Potters suffered past damages (without interest) of $3,668.16 and the present value of his future damages is $31,260.09 for a total of $34,928.25.

93.     Plaintiff Stacey Richards started collecting benefits when she was 55 years and 5 months old with an accrued SLA of $3,335.69. She selected a 50% JSA, which pays $2,951.08 a month. If reasonable up-to-date assumptions had been applied when Mrs. Richards retired, her benefit would be $3,003.26, which is $52.18 more per month. By reason of the use of the 1983 GAM/6% instead of reasonable, up-to-date assumptions, Mrs. Richards suffered past damages (without interest) of $1,408.86 and the present value of her future damages is $10,826.20 for a total of $12,235.06.

94.     Plaintiff Warren Washburn started collecting benefits when he was 55 years old with an accrued SLA of $1,804.90. He selected a 50% JSA, which pays $1,645.17 a month. If reasonable up-to-date assumptions had been applied when Mr. Washburn retired, his benefit would be $1,698.12, which is $52.95 more per month. By reason of the use of the 1983 GAM/6% instead of reasonable, up-to-date assumptions, Mr. Washbrun suffered past damages (without interest) of $529.50 and the present value of his future damages is $10,739.26 for a total of $11,268.76.

95.     Plaintiff Nancy Youngermann started collecting benefits when she was 62 years and 6 months old with an accrued SLA of $2,100.00.  She selected a 75% JSA, which pays $1,728.09 a month.  If reasonable, up-to-date assumptions had been applied when Mrs. Youngermann retired, her benefit would be $1,828.43, which is $100.34 more per

month.  By reason of the use of the 1983 GAM/6% instead of reasonable, up-to-date assumptions, Mrs. Youngermann suffered past damages (without interest) of $6,020.40 and the present value of her future damages is $17,635.34 for a total of $23,655.74.

96.    Plaintiff John Braxton started collecting benefits when he was 65 years old with an accrued SLA of $443.67.  He selected a 50% JSA, which pays $390.43 a month. If reasonable, up-to-date assumptions had been applied when Mr. Braxton retired, his benefit would be $408.20, which is $17.77 more per month.  By reason of the use of the 1983 GAM/6% instead of reasonable, up-to-date assumptions, Mr. Braxton suffered past damages (without interest) of $1,403.83 and the present value of his future damages is $2,553.21 for a total of $3,957.94.

97.    The chart below summarizes Plaintiffs' losses due to Defendants' use of unreasonable actuarial assumptions when calculating their benefits:

| | Brown | Suveg | Bobertz | Potters | Richards | Washburn | Youngermann | Braxton |
|---|---|---|---|---|---|---|---|---|
| **Monthly Shortfall** | $181 | $113 | $131 | $152 | $52 | $52 | $100 | $17 |
| **Past Damages (without interest)** | $13,575 | $7,371 | $3,554 | $3,668 | $1,408 | $529 | $6,020 | $1,403 |
| **Present Value of Future Damages** | $35,653 | $20,303 | $23,211 | $31,260 | $10,826 | $10,739 | $17,635 | $2,553 |

98.    Because the Plans used unreasonable, grossly outdated, or otherwise flawed actuarial assumptions throughout the Class Period, the benefits paid to participants and beneficiaries who receive JSAs are not actuarially equivalent to the SLAs they earned as of their benefit commencements dates in violation of ERISA §§ 205 and 204(c)(3), 29

U.S.C. §§ 1055 and 1054(c)(3).  Rather, the benefits payable under these forms are much lower than they should be

99.    Plaintiffs are participants in the Plans who are receiving benefits calculated on their benefit commencement dates using the 1983 GAM/6%.  Because their benefits were calculated using outdated, unreasonable mortality tables, Plaintiffs have been harmed because they have been receiving less each month than they would have been receiving if reasonable, up-to-date actuarial assumptions had been used.  Plaintiffs, along with other class members, have been substantially damaged as a result of receiving benefits below an actuarially equivalent amount.

100.    Plaintiffs exhausted all administrative remedies under the Plans by filing claims in accordance with the Retirement and Pension Plan Documents.  Claims were submitted in September 2020 and the claim and review process finished in February 2022 when the Retirement Plan Committee and Board of Trustees denied the appeals filed by Plaintiffs pursuant to the terms of the Plans.

## CLASS ACTION ALLEGATIONS

101.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the class (the "Class") defined as follows:

> All participants in and beneficiaries of the Plans who began receiving a JSA or QPSA after January 1, 2013 that was calculated using: (1) the 1983 GAM/6%; (2) the UP-84/7%; or (3) the UP-84/8%. Excluded from the Class are Defendants and any individuals who are subsequently to be determined to be fiduciaries of the Plans.

102.    The members of the Class are so numerous that joinder of all members is impractical.   Upon information and belief, the Class includes thousands of persons. According to the most recent Forms 5500, the Retirement Plan and the Pension Plan had 46,425 and 21,172 participants receiving payment at the end of 2020, respectively.

103.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs' claims and the claims of all Class members arise out of the same policies and practices as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

104.    There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members.   Common legal and factual questions include, but are not limited to:

A.    Whether the Plans' existing formulae for calculating JSAs and QPSAs provide benefits that are actuarially equivalent to SLAs;

B.    Whether the Plans' actuarial assumptions are reasonable;

C.    Whether Plaintiffs and Class members should have their benefits recalculated to conform with ERISA's actuarial equivalence requirements; and

D.    Whether Plaintiffs and Class members should receive payments to compensate them for past and future benefit payments that did not and will not satisfy ERISA's actuarial equivalence requirements.

105.    Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class actions.   Plaintiffs

have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

106.   This action may be properly certified under either subsection of Federal Rule of Civil Procedure 23(b)(1). Class action status is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status also is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

107.   In the alternative, certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

108.   If the Class is not certified under Rule 23(b)(1) or (b)(2), then certification under Rule 23(b)(3) is appropriate because the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## FIRST CLAIM FOR RELIEF
### Declaratory and Equitable Relief
### (ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))

109.    Plaintiffs re-allege and incorporate by reference all prior allegations in this Complaint.

110.    Defendants have improperly reduced JSAs for participants and beneficiaries of the Plans below the amounts that they would receive if those benefits were actuarially equivalent to an SLA, as ERISA requires.  *See* ERISA §§ 205(d)(1) and 204(c)(3), 29 U.S.C. § 1055(d)(1) and 29 U.S.C. § 1054(c)(3).

111.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to:  "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

112.    Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiffs seek declaratory relief, determining that the methodologies used by Defendants for calculating the actuarial equivalence of JSAs and QPSAs violate ERISA because they do not provide an actuarially equivalent benefit, as required by ERISA §§ 205(d)(1) and 204(c)(3), 29 U.S.C. § 1055(d)(1) and 29 U.S.C. § 1054(c)(3).  Moreover, Defendants have also caused some Class members, including Plaintiff Braxton, to forfeit part of their accrued benefit in violation of ERISA § 203(a), 29 U.S.C. § 1053(a).

113.    Plaintiffs further seek an order from the Court providing a full range of equitable relief, including but not limited to:

(a)     re-calculation, correction, and payment of JSA and QPSA benefits previously paid under the Plans;

(b)     an "accounting" of all prior benefits and payments;

(c)     equitable surcharge;

(d)     disgorgement of amounts wrongfully withheld;

(e)     disgorgement of profits earned on amounts wrongfully withheld;

(f)     a constructive trust;

(g)     an equitable lien;

(h)     an injunction against further violations; and

(i)     other relief the Court deems just and proper.

**SECOND CLAIM FOR RELIEF**
**Breach of Fiduciary Duty**
**(ERISA §§ 404 and 502(a)(3), 29 U.S.C. §§ 1104 and 1132(a)(3))**

114.    Plaintiffs re-allege and incorporate by reference all prior allegations in this Complaint.

115.    The Retirement Plan Committee and Board of Trustees are named fiduciaries of the Plans.

116.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent that person "(i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect

to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. As such, neither "named fiduciary" status, nor formal delegation is required for a finding of fiduciary status, and contractual agreements, such as the governing Plan documents, cannot override a finding fiduciary status when the statutory test is met.

117.    The Retirement Plan Committee and Board of Trustees are fiduciaries for the Plans because throughout the Class Period they have been named fiduciaries of the Plans, and/or exercised discretionary authority or control respecting the management of the Plans, and/or exercised authority or control over the management or disposition of the Plans' assets, and/or have had discretionary authority or discretionary responsibility in the administration of the Plans.  Among other things, during the Class Period, the Retirement Plan Committee and Board of Trustees have had authority or control over the determination of the amount and payment of benefits from the Plans.

118.    Defendant UPS is a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it has exercised discretionary authority or control with respect to the management of the Plans, and/or exercised authority or control over management or disposition of Plans' assets, and/or has discretionary authority or discretionary responsibility in the administration of the Plans, including but not limited to, with respect to its duty to appoint and monitor members of the Retirement Plan Committee and Board of Trustees.

119.    ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D) requires Defendant-fiduciaries to discharge their duties with respect to the Plans "in accordance with the documents and instruments governing the plan[s] insofar as such documents and plan instruments are consistent with" ERISA.

120.    The Plans are not consistent with ERISA because they use the all-male 1983 GAM/6%, UP-84/7%, and UP-84/8% to calculate benefits. As a result, the Plans' calculation of JSA benefits are not actuarially equivalent, resulting in participants and beneficiaries losing vested benefits in violation of ERISA.

121.    Here, the Defendants breached their fiduciary duties by following the Plan terms which violate ERISA because those terms result in participants receiving less than the actuarial equivalent of their vested accrued benefits.

122.    ERISA further imposes on fiduciaries that appoint other fiduciaries the duty to monitor the actions of those appointed fiduciaries to ensure compliance with ERISA. In allowing the Committees to pay benefits that were not actuarially equivalent in violation of ERISA, Defendant UPS breached its fiduciary duty to supervise and monitor the Committees.

123.    As a direct and proximate result of the Defendants' fiduciary breaches, participants in the Plans have lost, and are continuing to lose, tens of millions of dollars in vested accrued pension benefits.

124.    UPS and the Retirement Committee are jointly liable for the acts of the other as co-fiduciaries for the Retirement Plan.

125.   UPS and the Board of Trustees are jointly liable for the acts of the other as co-fiduciaries for the Pension Plan.

126.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to:  "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

127.   Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiffs seek declaratory relief, determining that the Plans' established methodologies for calculating JSAs and QPSAs do not provide actuarially equivalent benefits because they do not provide benefits with an equal present value.

128.   Plaintiffs further seek orders from the Court providing a full range of equitable relief including but not limited to:

(a)   re-calculation, correction, and payment of actuarially equivalent JSA and QPSA benefits previously paid under the Plans;

(b)   an "accounting" of all prior benefits and payments;

(c)   equitable surcharge;

(d)   disgorgement of amounts wrongfully withheld;

(e)   disgorgement of profits earned on amounts wrongfully withheld;

(f)   a constructive trust;

(g)   an equitable lien;

(h)   an injunction against further violations; and

(i)      other relief the Court deems just and proper.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and request that the Court award the following relief:

A.      Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Declare that the Plans have failed and continue to fail to properly calculate and pay JSA benefits that are actuarially equivalent to the SLA, in violation of ERISA;

C.      Order Defendants to correct and recalculate JSA and QPSA benefits that have been paid under the Plans;

D.      Order Defendants to provide an "accounting" of all prior payments of JSA and QPSA benefits under the Plans to determine the proper amounts that should have been paid;

E.      Order Defendants to pay all benefits improperly withheld, including under the theories of equitable surcharge and disgorgement;

F.      Order Defendants to disgorge any profits earned on amounts improperly withheld;

G.      Impose of a constructive trust;

H.      Impose of an equitable lien;

I.      Order Defendants to pay future benefits in accordance with ERISA's actuarial equivalence requirements;

J.      Award, declare, or otherwise provide Plaintiffs and the Class all relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper;

K.      Award to Plaintiffs' counsel attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

L.      Any other relief or remedy the Court determines is just and proper.

Dated: April 27, 2022.                        Respectfully submitted,

                                               *s/ David Worley*
                                              David J. Worley
                                              (GA Bar No. 776665)
                                              James M. Evangelista
                                              (GA Bar No. 707807)
                                              Kristi Stahnke McGregor
                                              (GA Bar No. 674012)
                                              **EVANGELISTA WORLEY, LLC**
                                              500 Sugar Mill Road, Ste. 245A Atlanta,
                                              GA 30350
                                              (404) 205-8400
                                              *david@ewlawllc.com*
                                              *jim@ewlawllc.com*
                                              *kristi@ewlawllc.com*

                                              **IZARD, KINDALL & RAABE LLP**
                                              Robert A. Izard (pro hac vice application
                                              forthcoming)
                                              Douglas P. Needham (pro hac vice
                                              application forthcoming)
                                              Oren Faircloth (pro hac vice application
                                              forthcoming)
                                              29 South Main Street, Suite 305
                                              West Hartford, CT 06107

Tel: (860) 493-6292
Fax: (860) 493-6290
rizard@ikrlaw.com
dneedham@ikrlaw.com
ofaircloth@ikrlaw.com

**BAILEY & GLASSER LLP**
Gregory Y. Porter (pro hac vice
application forthcoming)
Mark G. Boyko(pro hac vice application
forthcoming)
1054 31st Street, NW, Suite 230
Washington, DC 20007
Tel: (202) 463-2101
Fax: (202) 463-2103
gporter@baileyglasser.com
mboyko@baileyglasser.com

**KELLER ROHRBACK L.L.P.**
Erin M. Riley (pro hac vice application
forthcoming)
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel: (206) 623-1900
eriley@kellerrohrback.com

**KELLER ROHRBACK L.L.P.**
Jeffrey Lewis (pro hac vice application
forthcoming)
180 Grand Avenue, Suite 1380
Oakland, CA 94612
Tel: (510) 463-3900
jlewis@kellerrohrback.com

*Counsel for Plaintiffs*